UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.  2011 CR 10213 |
| | ) | |
| DENNIS DEGRAZIA | ) | |

**SENTENCING MEMORANDUM**

Defendant Dennis DeGrazia submits this memorandum to assist the court in its determination of a sentence that is sufficient but not greater than necessary to promote the goals Congress established when it enacted 18 U.S.C. § 3553.  Based on the history and characteristics of this defendant and the nature and circumstances of the offenses of conviction, along with all of the other § 3553 factors, that sentence is a term of probation with a community service obligation.

**Argument**

1. **Probation With Community Service Is An Appropriate Sentence Given Mr. DeGrazia's History and Characteristics**

Mr. DeGrazia has lived a life that most of us would aspire to.  He had the vision, drive and wherewithal to build from scratch a successful construction business that employed many people and thrived for 18 years.  He not only continues to provide jobs in his current position, he makes the extra effort to fill openings with disadvantaged, inner-city youths and returning war veterans, whom he actively recruits.  He also has a capacity that many who achieve good fortune in the business world lack -- Mr. DeGrazia is proud husband and father who truly puts his wife and five children first.  His professional accomplishments have not come at the cost of ignoring or being absent from his family.

The business that Mr. DeGrazia started as soon as he graduated from college was Standen Contracting Company, Inc., a construction company that operated from 1986 to 2004. *See* PSR at ¶ 106. Mr. DeGrazia and his partner built Standen into a large company with a general construction division that ultimately handled construction contracts in the tens of millions of dollars. Standen also had a division that did residential sound insulation projects ("RSIP"), which involved tearing out existing windows and doors in houses in the flight paths of major airports and installing custom-made soundproofed replacement windows and doors. Standen did this work in a number of cities across the country. Codefendant David Hebert worked with Mr. DeGrazia in the soundproofing division. At its busiest times, Standen employed in excess of 150 people directly and provided work for hundreds of other employees of subcontractors who worked on Standen jobs.

Standen was closed down after a catastrophic fire at an under-construction school building led to the inability to secure sufficient bonding to go forward. After a brief stint as employees at JK Scanlon, an East Falmouth construction company that took over Standen's RSIP contracts, Mr. DeGrazia and Mr. Hebert started up their own company, US Window and Door ("USWD"). USWD sought and obtained RSIP projects in Boston and elsewhere, including the C-11 and C-13 contracts with Massport at Logan Airport that are the subject of the indictment in this case. *Id.* at ¶¶ 104-105. USWD was forced to wrap up its operations as a result of the government's investigation and this prosecution.

In his current position with Advantage Weatherization Incorporated, Mr. Degrazia continues to help create many good-paying jobs while providing a valuable community service. Advantage provides weatherization services to low-income families throughout Massachusetts.

Even though Mr. DeGrazia has his pick of workers from an underemployed construction sector, he makes an extra effort to recruit the neediest:

> Mr. DeGrazia has been instrumental in recruiting workers from programs such as Youth Build Boston and Helmets to Hardhats … programs focused on providing good paying union jobs to both inner city youth and veterans who are returning from both Iraq and Afghanistan.  Mr. DeGrazia's efforts have helped numerous families make it through these difficult economic times that we are experiencing.

Letter from John C. Kelly, President, Advantage Weatherization Incorporated, attached as part of Exhibit 1.

Throughout his business career, Mr. DeGrazia has earned a reputation for honesty, integrity and diligence.  Christopher C. Whitney, a lawyer who regularly represented Standen, put it best in his letter to the court:

> In all of the years I have known Dennis, I have always found him to be a hard working, honest business man, and a loving father and family man.  …  In our many legal dealings, Dennis always took the high road, never the low road, even where the low road was an option and perhaps a more profitable option.  I never knew him to conduct his business affairs other than with the highest degree of integrity.  He productively employed many people, helping to put food on their family tables, provided them with excellent employee benefits, and always treated his employees fairly and with respect.

Letter from Christopher C. Whitney, attached as part of Exhibit 1.

Jack J. Vultaggio, another lawyer who has represented Mr. DeGrazia's businesses over the years also writes that honesty, integrity and trustworthiness are characteristics that make Mr. DeGrazia stand out:

> I guess the best way to describe Dennis' character … is to say he is the only person other than my immediate family I would ever consider to be a Trustee of my family trust.  He is honest, trustworthy, caring and compassionate.  I have worked with him on

> more than one deal in which he walked away from the negotiating table sacrificing a good deal on his behalf because of the needs of minority partners or employees. While he is a shrewd business man, he does not pursue undue advantage of people who are in a vulnerable position. Dennis does not believe in the old adage "a good deal is one when both sides walk away unhappy." He always pursues the "win, win" scenario.

Letter from Jack J. Vultaggio, Jr., attached as part of Exhibit 1.

    The traits Mr. DeGrazia has displayed over the years are not exactly universal in the rough and tumble real estate and construction industries: "[d]uring my career, men with his integrity are far and few between. A true breath of fresh air in the dog eat dog world of the construction business." *Id*. This is not a world where consideration for others is readily observable. Yet, another letter writer who has known Mr. DeGrazia from that world for more than ten years notes that: "Dennis' integrity, sense of responsibility, and general consideration for all of the people he came into contact with left a lasting impression." Letter from Robert H. Lane, attached as part of Exhibit 1. Another letter writer, Michael Otis, echoes Mr. Lane's observations: "Dennis has always been a hard worker getting up at 5:00 a.m. and concluding his day on several occasions after 7:00 p.m. Dennis has always been kind and always helps people who are in need of a hand." Letter from Michael Otis, attached as part of Exhibit 1.

    Given the nature and the demands of the construction industry, success often means that there is little or no time left over for family. Mr. DeGrazia, however, is a dedicated family man above all else. He has been together with his wife Mary Jane since 1979 and married to her since 1986. He has helped her raise five children that range in age from 15 to 23. To a person, Mr. DeGrazia's business colleagues have witnessed first-hand Mr. DeGrazia's devotion to his family: John Kelly writes that: "I have come to admire [Mr. DeGrazia] for how he has managed to

balance an intense work schedule yet still has time for his beautiful family. His family means the world to him and he often talks of their accomplishments and how proud he is of them and how they have grown up to be kind, courteous and respectful." Ex. 1.

Robert Lane has seen this side of Mr. DeGrazia too: "[t]he most integral part of Dennis' life is his wife and five children, all of whom reflect the extensive and positive parental involvement and guidance given by both parents. Dennis' week always includes considerable time with each of his children." *Id*. Mr. DeGrazia has never been guarded about the depth of his dedication to and love for his family even though showing love and emotion would more likely be ridiculed than valued in the construction industry: "[p]ersonally, even in the machismo world of commercial construction, Dennis was never afraid to reveal his emotions about his love for his wife and five children." Letter from Whitney, Ex. 1.

True to the reputation Mr. DeGrazia had earned, once Massport had changed its mind on Woodchucks and started its own investigation into DBE compliance on RSIP projects, as described more fully below, Mr. DeGrazia was open, truthful, honest and cooperative. He was the only contractor's representative who met with Massport's investigators and told the complete, unvarnished truth about Woodchucks. He again told the truth and cooperated when a DOT OIG investigator later visited him at USWD. As the government's sentencing motion indicates, Mr. DeGrazia went on to proffer truthfully and was prepared to testify truthfully at a trial if that proved necessary.

The First Circuit Court of Appeals has recognized and held that sentencing "necessitates a case-by-case approach, the hallmark of which is flexibility." *United States v. Prosperi*, 686 F.3d 32, 42 (1st Cir. 2012), *quoting United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008) (the range

5

of reasonable sentences is a universe with "expansive boundaries"). There is "no single reasonable sentence in any particular case, but, rather, a universe of reasonable outcomes." *Prosperi*, 686 F.3d at 43, *quoting United States v. Walker*, 665 F.3d 212, 234 (1st Cir. 2011). *See also United States v. Ocasio*, 914 F.2d 330, 336 (1st Cir. 1990) ("reasonableness is a concept, not a constant").

A sentence of probation certainly is firmly within the universe of reasonable outcomes for this particular defendant. As the Presentence Report and the letters from people who have known Mr. DeGrazia well for many years demonstrate, he is not a cutthroat business person who skates close to the ethical line, throws caution to the wind and does whatever it takes to make an extra buck, like many of his colleagues in the construction and real estate industries. His conduct in this case is out of character with the values he has respected, lived his life in accordance with and passed on to his children.

2.  **Probation With Community Service Is An Appropriate Sentence Given the Nature and Circumstances of the Offense**

In upholding probationary sentences for defendants facing advisory Sentencing Guideline ranges of 87-108 months, the First Circuit Court of Appeals held that making distinctions between and among white-collar fraud defendants based on the nature and circumstances of the particular fraud at issue was a relevant and appropriate part of sentencing. *See Prosperi*, 686 F. 3d at 46 ("in distinguishing the defendants from other white-collar fraud defendants, the court emphasized the absence of an intent to harm the Big Dig, or any direct intent on the part of the defendants to enrich themselves"). In other words, it matters whether the fraudulent scheme resembles the Bernie Madoff-type out-and-out, deliberate and calculated fraud that results in real

and measurable monetary loss and actual harm to others, or has little or nothing in common with that paradigm.

The fraud here is nothing like the Madoff paradigm. The defendants did not intend to harm the RSIP projects their companies were awarded or cause any loss to the taxpaying public. The government incurred no extra cost as a result of the fraud. It did not pay extra for materials not provided or work not performed. There is no allegation or proof that the winning bids were higher than they otherwise would have been absent the fraud. In fact, the same three or four companies bid on each available contract and the low bid often was separated from the next lowest by a few thousand or in some cases a few hundred dollars.

Unlike many fraud defendants who see an opportunity, concoct a fraudulent scheme and execute it, Mr. DeGrazia did not get into the RSIP business with the intention or for the purpose of committing fraud. He did not even know who Robert Dickerson and Woodchucks were when Standen first started bidding on and winning RSIP contracts. On the first few contracts awarded to Standen, Mr. DeGrazia made a good-faith, legitimate effort to identify and utilize a suitable Disadvantaged Business Enterprise ("DBE") but could not do so. Mr. DeGrazia documented his efforts and sought and obtained from Massport written waivers excusing compliance with DBE set-asides for those projects.[1]

Even when Mr. DeGrazia learned that one of his competitors had used Woodchucks on one of the contracts it had won, he did not use Woodchucks on Standen jobs until he called

---

[1] Mr. DeGrazia has undertaken extensive efforts to locate the waiver letters without success. He does not have access to Standen's records, which were taken by the bonding company after Standen was shut down. Due to their age (late 1980s early 1990s) the letters could not be located in Massport's files despite several days of reviewing dozens of boxes of warehoused records.

Massport's legal department and asked if Woodchucks was acceptable. He was told that Woodchucks could be used as long as it was certified by the State Office of Minority and Women Business Assistance ("SOMWBA"). Standen started using Woodchucks on its RSIP projects only after Mr. DeGrazia confirmed that Woodchucks was indeed SOMWBA-certified. Mr. DeGrazia's actions -- especially calling the project owner's legal department for permission to use Woodchucks -- are not the actions of a fraud artist looking for the opportunity to insert a do-nothing DBE into the RSIP program just to win bids.

     Mr. DeGrazia ultimately knew, however, that Woodchucks was not actively involved in the supply of custom windows suitable for use in the RSIP program. But Massport also knew, and had known for years. Massport specced the custom windows, required that they be purchased only from identified manufacturers and knew the Woodchucks could not supply them. Massport had its own representatives at pre-construction meetings and job walk-throughs where windows were carefully measured in private homes. Massport's representatives were present at job sites and saw windows delivered by by the manufacturers and installed by Standen and USWD crews. There was no sign of Woodchucks, ever. Yet project after project, year after year, Massport encouraged RSIP contractors to use Woodchucks, set high DBE participation goals based on Woodchucks' participation and accepted and passed along federal funds without question.

     Massport also knew that it was impossible to meet DBE participation goals without Woodchucks' participation as a supplier. DBE goals typically are met by subcontracting a portion of the work of a general contract to qualified DBE subcontractors. Think of the Big Dig

or the construction of a new commercial or government building where many trades are at work simultaneously for extended periods of time at open construction sites.

In RSIP projects, the "construction sites" are individual occupied homes. Every window and exterior door must be ripped out and replaced with custom-made soundproofed products, all on a very tight ten-day time frame with stiff penalties for any delay or inconvenience. The general contractors had no choice but to perform this sensitive work themselves with their own skilled crews. There was very little work left over to sub out to DBE subcontractors -- certainly not enough to meet the lofty DBE goals Massport set.

All of the players also knew that there was no DBE supplier out in the marketplace that legitimately could have supplied the custom-specced soundproofed windows and doors that could only be constructed by Massport-approved manufacturers. In other words, by using Woodchucks, USWD and the other RSIP general contractors were not depriving legitimate DBE suppliers of the opportunity to participate in RSIP projects.

For all of these reasons, the nature and circumstances of this offense are not such that the only appropriate sentence is a jail sentence. A term of probation with community service is sufficient but not greater than necessary to accomplish all statutory sentencing goals.

3. **Probation With Community Service Provides Appropriate Punishment, Deterrence and Respect for the Law**

In what the First Circuit Court of Appeals deemed an accurate assessment of the unimaginable situation a first-time offender finds himself in once he is accused of a crime, Judge Stearns made this observation as he imposed sentences of probation for the *Prosperi* white-collar fraud defendants:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

686 F.3d at 48.

Mr. DeGrazia had worked his entire adult life to develop a reputation for honesty, integrity, consideration for others and family values. Now he is a convicted felon. He went from Massport's RSIP Contractor of the Year in 2004 (runner up in 2003) to belly up with USWD, losing the entire $330,000 personal stake he contributed to start up that company. Although he has impressed a lot of people and set an example worthy of following, as the attached letters attest, he undoubtedly has lost some of the respect of his peers. He also has experienced the shame of telling his family, with whom he has worked so hard to instill and develop good values, about his conduct.

All that he has lost as a result of his criminal conduct is punishment. A term of probation is, of course, additional serious punishment, and is all that is required to achieve general deterrence of others. *See Gall v. United States*, 128 S.Ct. 586, 595-96 (2007) (straight probation without home confinement is punitive and the conditions imposed "substantially restrict ... liberty"). A jail sentence in this case in the name of general deterrence "may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Id*. (quoting sentencing judge). *See also United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the

absolute liberty to which every citizen is entitled' ") (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (footnote omitted).

A term of probation with a condition of home confinement also would be consistent with a move by the Sentencing Commission to make alternatives to incarceration available under the advisory guidelines to more defendants. On May 1, 2010, the Sentencing Commission sent to Congress a series of amendments to the sentencing guidelines that, in relevant part, increase the availability of sentences that do not include incarceration. An April 19, 2010 press release from the Commission describing the amendments quoted William K. Sessions, the Commission Chairman, as follows:

> The Commission has heard from virtually every sector of the criminal justice community that there is a great need for alternatives to incarceration. … Providing flexibility in sentencing for certain low-level, non violent offenders helps lower recidivism, is cost effective, and protects the public. The Commission's action in this area amounts to a very modest but important step in the right direction.

News Release, April 19, 2010, attached as Exhibit 2.

Mr. DeGrazia not only fits this profile, he also exhibits many of the characteristics that the Sentencing Commission has identified as indicators of reduced risk of recidivism. He is 51 years-old, is educated, has a stable employment history, is married with a family and is a non-violent offender who does not use illicit drugs. Two recent studies[2] conducted by the Sentencing

---

[2] Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines (hereinafter "Release 1"), http://www.ussc.gov/publicat/Recidivism_General.pdf; and A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score (hereinafter "Release 2"), http://www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf.

Commission show that fraud offenders are among the least likely to recidivate, as well as the following:

- Age: "Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.[3] Under the Parole Commission's Salient Factor Score (SFS), which is a better predictor of recidivism than Criminal History Category, the older the defendant is and the fewer the number of prior commitments, the less likelihood of recidivism. Age is a powerful component of recidivism prediction, which the Guidelines do not take into account.[4]

- Employment: Stable employment in the year prior to arrest is associated with a lower risk of recidivism.[5]

- Education: Recidivism rates decrease with educational level (no high school, high school, some college, college degree).[6]

- Family: Recidivism rates are associated with marital status (never married, divorced, married).[7]

- Illicit drug use: offenders using illicit drugs within one year prior to their instant offense have a higher recidivism rate (31.0%) than those not using illicit drugs (17.4%).[8]

- Non-Violent Offenders sentenced under the fraud, larceny and drug guidelines are the least likely to recidivate.[9]

---

[3] Release 1 at 12 & Exhibit 9.

[4] Release 2 at 8, 13-15.

[5] Release 1 at 12 & Exhibit 10.

[6] *Id*. at 12 & Exhibit 10.

[7] *Id*. at 12 & Exhibit 10.

[8] *Id*. at 13 and Exhibit 10.

[9] *Id*. at 13 & Exhibit 11.

The shame and embarrassment Mr. DeGrazia feels when he faces his children, wife and business colleagues is sufficient in and of themselves to ensure that he never will commit another crime. The court does not need to send him to jail to deliver a powerful message of deterrence.

For all of the foregoing reasons, a prison sentence is not a necessary component of adequate punishment and is not required to promote deterrence and respect for the law.

**Conclusion**

A sentence of probation with community service is sufficient punishment for this defendant who committed this offense and is not greater than necessary to promote all statutory sentencing goals.

DENNIS DEGRAZIA
By his attorney,

/s/ *E. Peter Parker*
E. Peter Parker
 B.B.O. #552720
151 Merrimac Street
Boston, MA  02114
(617) 742-9099

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on December 12, 2012.

/s/ *E. Peter Parker*
E. Peter Parker

13